COPY

1    Elizabeth J. Cabraser (State Bar No. 83151, ecabraser@lchb.com)
     Heather A. Foster (State Bar No. 184353, hfoster@lchb.com)
2    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 30th Floor
3    San Francisco, CA 94111-3339
     Telephone: (415) 956-1000
4    Facsimile: (415) 956-1008

5    Attorneys for Plaintiffs

6    *Additional plaintiffs' counsel listed on signature page

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10   LOUIS FUENTES, a resident of Junction, Texas          Case No.

11                Plaintiff,                                COMPLAINT FOR
                                                            DAMAGES AND              1070
12   v.                                                     INJUNCTIVE RELIEF

13   BAYER CORPORATION, an Indiana corporation,            Jury Trial Demanded
     successor to CUTTER BIOLOGICAL, a California
14   Corporation; BAXTER HEALTHCARE                        (1) Negligence
     CORPORATION, a Delaware corporation, and its         (2) Negligence Per Se
15   HYLAND DIVISION; ARMOUR PHARMACEUTICAL               (3) Fraudulent Omission and
     COMPANY, INC., a Delaware corporation and ALPHA          Concealment
16   THERAPEUTIC CORPORATION, a California                (4) Breach of Implied Warranty
     corporation,
17
                  Defendants.
18

19   I.    INTRODUCTION

20             1.      Defendants manufactured blood products known as "Factor VIII" and

21   "Factor IX" for the treatment of hemophilia, and sold these products to people with hemophilia in

22   the United States and worldwide, despite knowledge that the products were manufactured from

23   sick, high-risk donors and/or known to be contaminated with the virus that causes Non-A, Non-B

24   Hepatitis (now known as "Hepatitis C" or "HCV"). Defendants knowingly declined to timely

25   pursue or adopt treatment and manufacturing practices that would have prevented the infection of

26   Plaintiff with HCV, as described in more detail below. Defendants also continued selling old

27   stocks of products they knew to be contaminated with HCV even after they or others had

28   introduced safer products. Plaintiff is a person with hemophilia who contracted HCV through use

750361.1
                                                            COMPLAINT FOR DAMAGES
                                                              AND INJUNCTIVE RELIEF

1    of Defendants' contaminated products. This complaint describes the factual predicate for

2    Plaintiff's infection: a pattern of foot-dragging, denial, and obfuscation by the pharmaceutical

3    companies on whom his health and well-being depended.

4         2.    Defendants manufactured HCV-contaminated blood factor products using

5    human plasma taken from thousands of paid donors, including populations then known to be at

6    high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous

7    drug users. Defendants intentionally recruited urban homosexuals who had a history of viral

8    hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite

9    knowledge that the virus that causes HCV was a blood-borne disease prevalent in such

10   populations. Defendants continued using plasma taken from high-risk prison donors, even after

11   promising the FDA that they would cease doing so. Through their trade associations, Defendants

12   actively conspired to conceal these practices and to substantially delay product recalls and

13   implementation of safety measures.

14        3.    Defendants failed to fully and completely disclose the known risks of their

15   products, including the risk of HCV; failed to implement readily available screening tests that

16   would have prevented HCV by excluding contaminated plasma; failed to use available methods

17   of treating plasma to kill viruses, including treatment with solvents and/or detergents; and

18   concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused

19   by the products. Defendants also continued to sell old stocks of product that had not been treated

20   even after introducing a safer treated product, including stocks that Defendants knew or had

21   reason to know were made from pooled blood contaminated with HCV.

22        4.    Defendants' efforts to maximize profits came at the expense of the health

23   and lives of thousands of people with hemophilia in the United States and worldwide who were

24   needlessly infected with HCV, including LOUIS FUENTES.

25   **II.    JURISDICTION AND VENUE**

26        5.    Plaintiff alleges an amount in controversy in excess of $75,000, exclusive

27   of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

28   because there is complete diversity of citizenship between Plaintiff and Defendants.

1      6.      Plaintiff is informed and believes and on such information and belief

2  alleges that the conduct by Defendants that is relevant to the subject matter of this action took

3  place primarily in their respective headquarters location and in other facilities within the States of

4  California and Illinois, giving these states significant contacts to the claims asserted by Plaintiff

5  and creating state interests such that the choice of either or each of these states' laws to govern

6  the adjudication of this action is neither arbitrary nor fundamentally unfair.

7  **III.   PARTIES**

8      7.      Plaintiff LOUIS FUENTES, a resident of Junction, Texas, who has

9  hemophilia.  Plaintiff has already provided Defendant with a confidential Preliminary Patient

10  Profile Form ("PPPF"), with beginning Bates number L-PPF 003600.  The PPPF contains

11  substantial additional information regarding Plaintiff's claim.

12      8.      Plaintiff was infected with HCV and experienced physical and emotional

13  harm as a direct and proximate result of his use of Defendants' blood products.

14      9.      Plaintiff would not have chosen to be treated with Defendants' blood

15  products, nor would have his guardians, had they known of or been informed by Defendants of

16  the true risks of using those products or the nature of the sources of the products.

17      10.     Defendant CUTTER BIOLOGICAL ("CUTTER"), the predecessor of

18  Miles, Inc., and Defendant BAYER, was a California corporation headquartered in Berkeley,

19  California at all pertinent times.  At all pertinent times CUTTER and its successors Miles, Inc.

20  and BAYER regularly and systematically engaged in the harvesting and collection of human

21  plasma and the processing, manufacturing, marketing, sales and distribution of factor

22  concentrates produced from such plasma, to which Plaintiff was exposed and which contributed

23  directly or indirectly to Plaintiff's infection with HCV.

24      11.     Defendant BAYER CORPORATION ("BAYER"), formerly Miles, Inc., is

25  and was an Indiana corporation, authorized to do business in all 50 states and the District of

26  Columbia.  Miles, Inc. had its principal place of business operation in Elkhart, Indiana, while its

27  successor BAYER has its principal place of business in Pennsylvania, with offices located at 100

28  BAYER Road, Pittsburgh, Pennsylvania 15205.  At all pertinent times BAYER and its

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   predecessors Miles, Inc., and CUTTER regularly and systematically engaged in the harvesting

2   and collection of human plasma and the processing, manufacturing, marketing, sales and

3   distribution of factor concentrates produced from such plasma, to which Plaintiff was exposed

4   and which contributed directly or indirectly to Plaintiff's infection with HCV.

5          12.    Defendant BAXTER HEALTHCARE CORPORATION ("BAXTER") is a

6   Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with

7   its principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield,

8   Illinois 60015.  At all times pertinent, Defendant BAXTER, and/or its HYLAND DIVISION, had

9   its main manufacturing plant in Glendale, California.  At all times pertinent, Defendant

10  BAXTER, and/or its HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol

11  Laboratories, regularly and systematically engaged in the harvesting and collection of human

12  plasma and the processing, manufacturing, marketing, sale and distribution of FACTOR

13  CONCENTRATE products produced from such plasma, to which Plaintiff was exposed and

14  which contributed directly or indirectly to Plaintiff's infection with HCV.

15         13.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC.

16  ("ARMOUR") is a Delaware corporation, with its principal place of business in Pennsylvania,

17  with offices located at 500 Arcola Road, P.O. Box 1200, Collegeville, Pennsylvania, 19426-0107.

18  At all times pertinent,  ARMOUR regularly and systematically engaged in the harvesting and

19  collection of human plasma and the processing, manufacturing, marketing, sales and distribution

20  of factor concentrate products produced from such plasma, to which Plaintiff was exposed and

21  which contributed directly or indirectly to Plaintiff's infection with HCV.

22

23         14.    Defendant ALPHA THERAPEUTIC CORPORATION ("ALPHA") is a

24  California corporation, with its principal place of business in California, with offices at 5555

25  Valley Boulevard, Los Angeles, California 90032.  At all times pertinent, Defendant has been

26  regularly and systematically engaged in the harvesting and collection of human plasma, and the

27  processing, manufacturing, marketing, sale and distribution of factor concentrate products

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   produced from such plasma, to which Plaintiff was exposed and which contributed directly or

2   indirectly to Plaintiff's infection with HCV.

3           15.    Defendants CUTTER, BAXTER, ARMOUR and ALPHA (hereinafter

4   collectively referred to as "Defendants"), acting on behalf of themselves and/or their predecessor

5   and/or successor corporations, collected, harvested and/or processed human plasma and/or

6   manufactured, marketed, sold and distributed factor concentrate products that were contaminated

7   with HCV.  In the alternative, one or more of said Defendants participated in the collection,

8   harvesting and/or processing of human plasma, and/or the manufacturing, marketing, distribution

9   and sale of factor concentrate products, that were contaminated with HCV; or assumed or became

10  responsible for, the liabilities of the Defendants and their predecessor or successor corporations

11  who did participate in the collection, harvesting and/or processing of human plasma, and/or the

12  manufacturing, marketing, distribution or sale of factor concentrate products, that were

13  contaminated with HCV, without limitation thereto.

14          16.    At all times herein mentioned, Defendants were fully informed of the

15  actions of their agents and employees, and thereafter no officer, director or managing agent of

16  Defendants repudiated those actions, which failure to repudiate constituted adoption and approval

17  of said actions, and Defendants thereby ratified those actions.

18  IV.    **FACTUAL ALLEGATIONS**

19         A.      **Hemophilia and Its Treatment**

20          17.    Hemophilia is an inherited condition that causes uncontrolled

21  hemorrhaging or bleeding.  Hemophilia results from a deficiency of blood components essential

22  for coagulation.  The most common form of the disease is hemophilia A, characterized by a lack

23  of a blood protein known as Factor VIII, which affects approximately one in 10,000 males.

24  Factor VIII is commonly called "AHF" or anti-hemophilic factor.  Hemophilia B is characterized

25  by absence of another blood protein, known as Factor IX, affecting about one in 40,000 males.

26  Plaintiff LOUIS FUENTES has severe hemophilia A.

27          18.    The treatment of hemophilia involves intravenous introduction, called

28  infusion, of the missing blood proteins required to stop bleeding.  The two most prevalent forms

- 5 -
750361.1

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

of such treatment are cryoprecipitate and factor concentrates. Factor concentrates are the products made by Defendants in this action. Cryoprecipitate is made by freezing plasma, the fluid component of circulating blood in which various proteins, including Factor VIII and Factor IX, are contained; thawing the frozen plasma; and isolating Factor VIII from the plasma through centrifugal concentration. Cryoprecipitate is an effective therapeutic agent for patients with hemophilia A. Hemophilia B has been effectively treated with the use of fresh frozen plasma containing Factor IX. Cryoprecipitate and fresh frozen plasma are made from small numbers of donors, who are generally unpaid volunteers.

19.    In the late 1960s to early 1970s, Defendants began to market factor concentrates, which contained Factor VIII and Factor IX in higher concentrations than had been available in either cryoprecipitate or fresh-frozen plasma. To produce factor concentrates, Defendants mixed pools of plasma from five to over twenty thousand donors at a time, a large percentage of which were paid donors. These large pools were then subjected to processes to concentrate Factors VIII and IX.

**B.    Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

20.    Shortly after the initial commercial marketing of Factor VIII and IX concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were reported in association with these products. By that time, Defendants knew of serious diseases caused by unidentified agents transmissible by blood and Factor VIII and IX. Defendants failed to warn Plaintiff or the medical community of these adverse effects, violating industry standards and federal regulations.

21.    By 1976, only a few years after Defendants' factor concentrate products went on the market, the United States Food and Drug Administration ("FDA") Bureau of Biologics held a conference titled *Unsolved Therapeutic Problems in Hemophilia*. The research articles compiled from the conference discussed the high incidence of disorders in patients using Defendants' products, such as liver dysfunction, enlarged spleen, Hepatitis B, and Non-A, Non-B Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded that these

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   disorders were tied to the patients' use of factor concentrates, and emphasized the risks entailed in

2   producing such concentrates using plasma from paid donors.  For instance, Robert Gerety of the

3   FDA Bureau of Biologics, Division of Blood and Blood Products, reported that the agent or

4   agents of NANB Hepatitis "appear to be blood borne, perhaps to be associated with a form of

5   chronic hepatitis, and to represent a considerable risk to recipients who repeatedly require the

6   administration of blood products." Gerety, et al., *Viral Antigens and Antibodies in People with*

7   *Hemophilia* (1977).  Gerety noted that "[t]he use of large plasma pools from paid donors no

8   doubt contributes to the risk of HBV [Hepatitis B] infection from these products," and stated that

9   "an all voluntary blood donor system is being pursued as a result of the known increased risk of

10  PTH [post-transfusion hepatitis] from blood derived from commercial donors." As described

11  below, however, Defendants not only refused to implement such a voluntary donor system, but

12  instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from

13  which Defendants could make other commercially valuable products as well.

14           22.     At all times material to this Complaint, Defendants failed to adequately

15  warn Plaintiff or his physicians of the serious adverse side effects of their products.  Although

16  Defendants' package inserts mentioned a risk that plasma "may" contain the causative agent of

17  viral hepatitis, this warning was seriously deficient in that: (a) Defendants failed to disclose that

18  the risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk

19  donors and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b)

20  while "hepatitis" simply means inflammation of the liver, and may be a relatively benign,

21  temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their

22  products were believed to present a considerable risk of severe liver damage and a significantly

23  elevated risk of liver cancer; (c) Defendants misleadingly stated that the source plasma used in

24  preparation of their products had been found to be non-reactive for Hepatitis B surface antigen

25  (HBsAg)—implying that no viral hepatitis was present in the plasma—and falsely stated that

26  available methods were not sensitive enough to detect all units of potentially infectious plasma,

27  failing to disclose that in fact Defendants had refused to implement the more sophisticated

28  Hepatitis B Core antibody (HBc) test which would have excluded the majority of plasma

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    contaminated by hepatitis; and (d) Defendants' labeling disclosed that their products were made

2    from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk

3    of disease, and that the particular groups of paid donors targeted by Defendants were known to be

4    the highest risk groups.

5        23.    The demand for and supply of anti-hemophilic factor rapidly increased

6    during the 1970s, with commercially-manufactured concentrate accounting for a large proportion

7    of the increase in supply.  In 1977, a federal report projected that the volume of factor

8    concentrates manufactured would increase substantially by 1980.  Division of Blood Diseases and

9    Resources, National Heart, Lung and Blood Institute, *Study to Evaluate the Supply-Demand*

10   *Relationships for AHF and PTC Through 1980*, at page 8; hereinafter "NHLBI Report."

11       24.    In order to sell more factor concentrates to this growing market,

12   Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors.

13   Defendants recruited paid donors from those populations most likely to respond to the financial

14   incentive to donate:  poor inner city residents, drug abusers, prisoners, and residents of

15   impoverished developing countries such as Haiti and Nicaragua.

16       25.    Defendants purposefully sought out paid donors despite knowing that the

17   risk of diseases transmissible by blood was far greater among paid donors than among volunteers.

18   Because no test was yet available in the 1970s for the NANB Hepatitis virus, an essential means

19   to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors

20   that were inconsistent with good health—precisely those populations from which Defendants

21   were recruiting paid donors.  Some studies indicated that paid donors were up to ten times more

22   infectious than volunteer donors.  For this reason, the National Blood Policy, adopted by the

23   federal government in July 1973, advocated conversion to an all-volunteer blood supply.

24   Defendants, however, not only continued to use paid donors, but also focused their recruiting

25   efforts on the highest risk populations.

26       26.    Defendants had an additional financial incentive for recruiting paid donors.

27   Factor VIII and Factor IX are only two of many products that can be made for commercial sale

28   from human plasma.  According to the NHLBI Report, by the late 1970s at least 17 different

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   therapeutic components of blood were manufactured by the process of "fractionating" plasma into

2   its various elements.  The NHLBI Report noted that, "as the costs of fractionation have increased,

3   fractionators have produced as many products as possible from a liter of plasma." *Id.* at 65.

4        27.    Blood derivatives used as vaccines or therapeutics had particularly high

5   economic value for Defendants.  The NHLBI Report noted that plasma with a very high titer, or

6   antibody level, for a corresponding antigen is "very expensive." *Id.* at 41.  Such products are

7   manufactured from source plasma drawn from donors who have been sensitized to a particular

8   antigen.  *Id.*  The NHLBI Report specifically stated, however, that "plasma collected for high

9   antibody titer **cannot** be used for fractionation into therapeutic products," such as Defendants'

10  factor concentrate.  *Id.* (emphasis added).

11       28.    Defendants targeted donors with high titers to Hepatitis B antigens in order

12  to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary

13  immunity to the Hepatitis B virus.  Despite the warning in the NHLBI report, Defendants used the

14  same high-titer plasma obtained for making HBIG to manufacture their Factor VIII and IX

15  products used by people with hemophilia.  Defendants thus sought to maximize profits by

16  producing "as many products as possible from a liter of plasma," while ignoring industry

17  standards that precluded the use of high-titer plasma for other therapeutic products.

18       29.    Beginning in about 1978, Defendants began targeting homosexual donors

19  in known urban gay communities.  Because urban homosexuals had been reported in the 1970s to

20  have exceptionally high prevalence of Hepatitis B infection, Defendants knew that such donors

21  would provide a reliable source of plasma for the manufacture of commercially valuable HBIG.

22       30.    By the 1970s, it was also well-known in the public health community that

23  urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other

24  diseases, including NANB Hepatitis, which were transmitted by blood and were believed to have

25  serious adverse consequences.  Despite this knowledge, Defendants used the same plasma pool

26  from urban homosexuals to manufacture both HBIG and Factor VIII and IX.

27       31.    By the 1970s, it was also well-established that plasma from prison

28  populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   the concentration of intravenous (IV) drug users in prisons. By 1974, the alanine

2   aminotransferase ("ALT") test was available to test for elevated levels of liver enzymes called

3   SGOT that indicate the presence of hepatitis. Prisoners were associated with SGOT levels of

4   over 60 IUs per ml, a level that increases the risk of Hepatitis C transmission by a factor of 6.

5   Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to

6   manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff, his

7   physicians, or the FDA.

8           32.    In light of Defendants' special knowledge of the disease patterns among

9   urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX

10  manufacture, Defendants had duties to: (a) discontinue the practice of using such high risk

11  donors; (b) disclose the risk to Plaintiff, his physicians, and the FDA, including the ongoing risk

12  of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still

13  marketed to patients; (c) implement procedures to kill blood-borne diseases in the products; and

14  (d) recall existing products from distribution or further use. Instead, Defendants continued to

15  conceal their recruitment of high-risk donors and to resist warnings and recalls, and failed to

16  implement procedures to make their products safe.

17          33.    By no later than 1978, Defendants knew of the availability of a new test to

18  determine whether an individual had a history of viral hepatitis, which would have disqualified

19  the donor from providing plasma for the manufacture of Factor VIII or IX. By testing a person's

20  serum for the presence of the core to the Hepatitis B antibody, a history of viral hepatitis could be

21  verified. This was known as the "HBc test." Published, peer-reviewed literature shows that the

22  HBc test was in use by researchers to determine that homosexual AIDS victims had a history of

23  viral hepatitis by no later than December 1981. Gottlieb, et al., *Pneumocystis Carinii Pneumonia*

24  *and Mucosal Candidiasis in Previously Healthy Homosexual Men*, 305 New Eng. J. Med. 1425-

25  1431 (1981).

26          34.    Use of the HBc test would have eliminated approximately 75% of

27  homosexual plasma donors and over 90% of promiscuous urban homosexuals. It would have

28  eliminated almost 100% of intravenous drug users.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1     35.    Use of the HBc and ALT tests together by Defendants by 1981 would have

2     eliminated the vast majority of the transmitters of HCV from the blood and plasma pools of the

3     nation, before the height of the Hepatitis C epidemic.  If Defendants had implemented this test in

4     a timely manner, Plaintiff more likely than not would not have been infected with HCV as a result

5     of factor concentrate use.

6     36.    As noted below, federal regulations required plasma donors to be in good

7     health, and donors with a "history of viral hepatitis" were by definition unacceptable as blood or

8     blood plasma donors.  Persons with a history of viral hepatitis were excluded not only because of

9     the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous

10    behavior of the prospective donor that carried the risk of transmitting other viruses in addition to

11    hepatitis.  A reasonable and prudent plasma fractionator would not accept a HBc positive donor

12    and expect to be in compliance with federal regulations as of 1978.

13    37.    After public reports of the first hemophilia AIDS cases in July 1982,

14    government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to

15    eliminate plasma contaminated by the transmitter of AIDS and Hepatitis C.  HBc testing was also

16    strongly suggested to Defendants by the CDC at a meeting of the United States Public Health

17    Service ("PHS") on January 4, 1983.  Despite this urging, Defendants continued to use

18    contaminated plasma donations that would have been excluded by the HBc test and continued to

19    conceal from Plaintiff, his physicians, and the FDA the dangerous practice of targeting donors at

20    highest risk for hepatitis.  At a January 6, 1983 meeting of Defendants' trade association, the

21    Pharmaceutical Manufacturer's Association, Defendants agreed not to implement the highly

22    effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did

23    little to screen out donors at high-risk for Hepatitis C transmission.

24    38.    As late as December 13, 1983, years after the HBc test was available, a

25    memorandum from CUTTER's responsible head, Stephen Ojala, reporting back on a meeting

26    held by Defendants, shows that Defendants conspired to propose a "task force" to further study

27    the use of HBc as an intentional, bad faith "delaying tactic for the implementation" of the test.

28

- 11 -
750361.1

**C.**   **Defendants Also Declined to Implement Available Treatment With Solvents and/or Detergents to Kill Blood-Borne Diseases, and Continued to Dump Contaminated Product on the Market After Safer Product Was Available**

39.   In the late 1970s and early 1980s, it was recognized that viruses were in all factor concentrate products.  Treatment with solvents and/or detergents was available at that time to eliminate many of these viruses, including HCV.  Defendants were required to take reasonable steps to eliminate contamination, but Defendants failed to utilize these available technologies to eliminate the viruses in a timely manner.

40.   Solvent and/or detergent treatment was available to Defendants by the late 1970s as a simple and effective method of eliminating viruses in factor concentrate products.  Solvents and/or detergents effectively kill viruses such as HCV by destroying the viruses' lipid envelope.  This method is simpler than heat treatment, and unlike heat treatment does not interfere with the Factor VIII and IX proteins needed for blood clotting.

41.   Solvents and/or detergents were well-known, commercially available products as of the 1970s, and studies in which solvent and/or detergent treatment was used to disrupt viruses were published in the 1970s in peer-reviewed journals.  In 1980, Dr. Edward Shanbrom, a former Baxter scientist, received a patent for a detergent treatment process for viral inactivation of factor concentrate.  Dr. Shanbrom describes the implementation of this process as "as easy as washing your hands."

42.   After receiving the patent, Dr. Shanbrom approached Defendants about implementing his method, but Defendants refused to heed Dr. Shanbrom's advice.  Defendants refused to even commit any resources to investigate the solvent and/or detergent method.

43.   Defendants were notified of the successful use of organic solvents to destroy lipid viruses, including NANB, in factor concentrates by the New York Blood Center ("NYBC") at the National Hemophilia Federation's meeting on October 27, 1983.

44.   In 1984, Dr. Prince and Dr. Horowitz of the NYBC published the results of their successful use of the solvent detergent process in well-known medical journals.  They

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    offered to license the process to Defendants for a reasonable fee.  In 1985, the NYBC obtained a

2    license from the FDA to market a solvent detergent inactivated factor concentrate.

3         45.    By March, 1984, Defendants obtained licenses to sell Factor VIII treated

4    with dry heat to inactivate viruses, and Defendants had obtained such licenses for Factor IX by

5    October, 1984.  The FDA did not allow them to label these products as hepatitis safe.  By fall of

6    1984, Defendants were notified by treaters that previously-untreated patients in their clinical trials

7    using their dry heated products developed elevated ALT enzymes, indicative of NANB

8    infections.

9         46.    Defendants were therefore aware in 1984 that dry heat did not effectively

10   inactivate the virus that causes HCV, and that solvent detergent treatment methods did eliminate

11   the risk of HCV infection, but chose not to employ the effective and efficient solvent detergent

12   technology.  Instead, Defendants continued to sell their contaminated dry heat product for at least

13   four more years, resulting in the needless infection of Plaintiff and many other hemophiliacs.

14        47.    A recent CDC study documented the comparative effectiveness of the dry

15   heat and solvent detergent inactivation methods. The study reported that "84% of previously

16   untreated patients infused with dry-heated Factor VIII products developed non-A, non B

17   hepatitis... ."  Soucie, Richardson, Evatt et al., *Risk Factor for Infection with HBV and HCV in a*

18   *Large Cohort of Hemophiliac Males*, 41 Transfusion 338-343 (2001).

19        48.    The same CDC study reported that "solvent detergent treatment of blood

20   components [was] found to be more effective against enveloped viruses than heat treatment ...

21   No cases of HBV, HCV, or HIV transmission through solvent detergent virus inactivated

22   products have been found in prospective studies of previously untreated patients..."

23        49.    The study further reported "in our data, the first dramatic decline in HCV

24   prevalence appears in the 1987 birth cohort.  The drop in HCV transmission correlates with the

25   licensing of solvent detergent treatment of Factor IX products in 1987.  In addition, this cohort

26   would have been the first to benefit from the screening of blood donors using the surrogate

27   markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated with

28   a markedly decreased risk of HCV infection from blood transfusions."

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

50.     The study states further that "the residual transmissions after 1987 possibly represent the use of product already manufactured or product manufactured during the interval required to implement the new technology. The 18-month shelf life of factor concentrates placed those people with hemophilia born as late as 1989 at risk of infection." The study goes on to recommend testing for all people with hemophilia who received infusions of Defendants' blood products prior to 1992.

51.     By 1988, it was clear to the medical and scientific community what Defendants had long known: dry-heated factor concentrates were transmitting the potentially deadly NANB virus, and safer products were available. This knowledge prompted the CDC to publish recommendations that dry-heated products no longer be used by hemophiliacs. Defendants continued sales of their dry-heated products after these warnings, however, and never undertook a large-scale recall of dry-heated product. Defendants finally introduced solvent detergent-treated products to the market in 1988 and 1989, but continued to sell their NANB-contaminated dry-heated factor concentrates after this date.

52.     The failure of Defendants to implement solvent and/or detergent viral inactivation techniques in a timely manner, to warn of the risk that dry heat treated Factor VIII and IX blood products could transmit HCV, and to recall dry heat-treated products that posed this risk caused the needless infection of thousands of people with hemophilia with HCV, including Plaintiff. Even after Defendants knew or should have known that solvent and/or detergents effectively destroyed HCV, they continued to sell dry heat-treated Factor VIII and IX, and refused to recall these dangerous products from the market.

**D.     Defendants Fraudulently Misrepresented the Safety, and Concealed the Dangers, of Their Factor VIII and IX Products**

53.     Defendants engaged in a pattern and practice of fraudulent concealment of their dangerous practices, fraudulent misrepresentations regarding their efforts to assure safety, and fraudulent misrepresentations regarding the risk of Hepatitis C, in order to maintain profits from both factor concentrates and HBIG. A summary of Defendants' fraudulent misrepresentations and concealment is set forth below.

- 14 -

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

54.     On July 27, 1982, a meeting of the Public Health Service was held as the result of the CDC's report that three people with hemophilia had contracted AIDS. The responsible heads of Defendants were in attendance, along with officials from the National Hemophilia Foundation, CDC and FDA. Defendants were aware that they had used plasma from known, targeted homosexuals in the manufacture of their Factor VIII and IX blood products. These products had a shelf life of two years and were either in production or already on the shelves in pharmacies waiting to be infused by people with hemophilia who purchased them. Defendants failed to disclose these facts at the meeting where CDC officials were present, despite knowledge that the CDC's primary concern at that meeting was the contamination of Factor VIII and IX by the agent that transmitted AIDS, which, like hepatitis, was already well-known to be epidemic in the targeted homosexual population. (CUTTER memorandum dated August 3, 1982.)

55.     In or about December, 1982, Rodell, the responsible head for BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would no longer use prison plasma in the production of factor concentrates. In fact, BAXTER, unbeknownst to the FDA, continued to use prison plasma in factor concentrate production through October 1983. BAXTER memorandum dated October 20, 1983.

56.     On January 5, 1983, an AIDS meeting was held at Children's Orthopedic Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States. Representatives of Defendants were present at the meeting with treaters and patients. A patient asked representatives from Defendants the following question: "Is the plasma from homosexuals, prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?" Defendants did not admit targeting or using plasma from homosexuals, prisoners or inner city IV drug abusers. Defendants' representatives made no response to the question, thereby concealing the true risk created by the use of plasma from known homosexuals, IV drug abusers and prisoners in the manufacture of factor concentrates.

57.     At the January 5, 1983 meeting, and in the presence of the patients, one of the treating physicians, Dr. Kasper, asked CUTTER's Stephen Ojala: "These [plasma] centers

1   seem to be in rundown centers of town.  Is there a move to move them to rural towns?" Ojala

2   answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti,

3   Seattle, Clayton, NC., and San Diego.  We do not have centers in L.A. or San Francisco." This

4   answer was misleading because Ojala failed to state that CUTTER's largest and first plasma

5   center was located at Arizona State Penitentiary.  CUTTER also had a center at the Las Vegas

6   Prison.  Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison

7   plasma, due to homosexual practices and drug abuse in the prison donor population.  Many of

8   CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown

9   Oakland, California.  CUTTER had also used plasma from centers which targeted known

10  homosexuals.  In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a

11  center which targeted known homosexuals, because a donor was hospitalized with full blown

12  AIDS.  The plasma was intended for factor concentrate and HBIG production, but was not used

13  because it had thawed on the way to the processing plant.  Upon receiving a report of this incident

14  from CUTTER, the FDA indicated a recall might have been necessary if the plasma had been

15  incorporated into factor concentrate final product.  Ojala omitted any mention of these facts and

16  circumstances in his response to Dr. Kasper regarding the location of their plasma centers.

17  (CUTTER memorandum dated January 5,1983.)

18          58.    On January 14, 1983, responsible heads from Defendants attended a

19  meeting of the National Hemophilia Foundation ("NHF").  Defendants were very concerned that

20  the NHF would insist on a recommendation that HBc testing be implemented, consistent with the

21  CDC recommendation 10 days earlier.  In order to defer a NHF recommendation that HBc testing

22  be used, Michael Rodell, a representative of BAXTER, told NHF officials on behalf of

23  Defendants, that surrogate testing was in the "R and D," or "Research and Development," stage

24  currently.  Rodell concealed the fact that the CDC had strongly recommended use of the HBc

25  antibody test as a screening device for high risk donors.  The HBc antibody test was not in the "R

26  and D" stage, and was suitable for use as a screening device for high risk AIDS and Hepatitis C

27  donors.  In fact, the HBc test had been approved in 1979 by the FDA as a test to be used to

28  ascertain a history of previous hepatitis B infection, and to screen blood and plasma donors.

1    Donors with a hepatitis history were specifically prohibited pursuant to the federal regulations (21

2    C.F.R. § 640.63). Rodell acknowledged that implementation of the HBc test would eliminate

3    high titered immunoglobulin donors, but failed to disclose that opposition to use of the test was

4    based on economic rather than safety concerns.

5            59.    At the January 14, 1983 meeting, Defendants concealed their advertising in

6    publications distributed among urban homosexuals, for the specific purpose of attracting them to

7    plasma centers which supplied high titered plasma to Defendants. Defendants also concealed

8    their extensive use of prison plasma, and failed to reveal their "gentlemen's agreement" with the

9    FDA to discontinue use of these plasma sources immediately. (CUTTER Memorandum dated

10   January 17, 1983.)

11           60.    On or about December 15, 1983, Rodell, then the head of Armour

12   Pharmaceutical Company, Inc., told members of the federal Blood Product Advisory Committee

13   (BPAC) and FDA officials that Defendants wanted a three-month deferral in implementation of

14   any recommendations by the BPAC or FDA that HBc testing be required for plasma donors.

15   Rodell told the FDA that the purpose of the deferral was to prepare a response to the proposed

16   recommendation. In fact, Defendants had agreed to seek the three-month hiatus as a "delaying

17   tactic" to avoid implementing the test, and the request for a deferral was made in bad faith.

18   (CUTTER memorandum dated December 13, 1983.)

19           61.    Defendants fraudulently misrepresented the risk of Hepatitis C due to

20   factor concentrates, failed to disclose accurate warnings of the risk to Plaintiff or his physicians,

21   and fraudulently purported to be doing "everything possible" to improve safety, when in fact

22   Defendants maximized the risk by recruiting high-risk donors and by resisting and obstructing

23   HBc testing, treatment with solvents and/or detergents, and other measures that would truly have

24   reduced the risk.

25   **E.    Defendants' Activities Were Subject to Applicable Federal Regulations,**
26   **Which Evidence the Standard of Care With Which Defendants Should Have**
     **Complied**

27           62.    Blood derivatives such as Factor VIII and IX are prescription biologicals

28   subject to federal regulation as both "biological products" and "drugs." Public Health Service

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   Act, "Regulation of Biological Products," 42 U.S.C. § 262; Food, Drug & Cosmetic Act

2   ("FDCA"), 21 U.S.C. § 301, *et seq. (2005).*

3              (a)     21 U.S.C. § 331(b) prohibited and continues to prohibit

4   "adulteration or misbranding of any … drug . . . ."

5              (b)     21 U.S.C. § 351(a)(2)(B) provided and continues to provide that

6   "[a] drug . . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or

7   controls used for, its manufacture, processing, packing, or holding do not conform to or are not

8   operated or administered in conformity with current good manufacturing practice to assure that

9   such drug meets the requirements of this chapter as to safety. . . ."

10             (c)     21 U.S.C. § 352 provided and continues to provide that "[a] drug...

11  shall be deemed to be misbranded. .. if its labeling is false or misleading in any particular."

12             (d)     21 U.S.C. § 352(f)(2) provided and continues to provide that a drug

13  shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use. ..

14  where its use may be dangerous to health."

15             (e)     21 U.S.C. § 352(n) provided and continues to provide that a drug

16  shall be deemed to be "misbranded" unless the labeling included information concerning side

17  effects and contraindications as required in federal regulations.

18             (f)     21 U.S.C. § 321(n) provided and continues to provide that if an

19  article is alleged to be misbranded because the labeling or advertising is misleading, then the

20  determination of whether the labeling or advertising is misleading shall take into account "not

21  only representations made or suggested" by affirmative statements, "but also the extent to which

22  the labeling or advertising fails to reveal facts material in the light of such representations or

23  material with respect to consequences which may result from the use" of the drug.

24             63.     At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided and

25  continues to provide as follows, with respect to information to be provided with the sale of

26  Defendants' products:

27              Warnings: Under this section heading, the labeling shall describe
                serious adverse reactions and potential safety hazards, limitations in
                use imposed by them, and steps that should be taken if they occur.

28              The labeling shall be revised to include a warning as soon as there

                                                        COMPLAINT FOR DAMAGES
                                                        AND INJUNCTIVE RELIEF

1    is reasonable evidence of an association with a drug; a causal
2    relationship need not have been proved.

3    64.    At all times material to this Complaint, 21 C.F.R. § 200.5 provided and

4    continues to provide as follows:

5    Manufacturers and distributors of drugs and the Food and Drug
     Administration occasionally are required to mail important
     information about drugs to physicians and others responsible for
6    patient care. In the public interest, such mail shall be distinctive in
     appearance so that it will be promptly recognized and read.

7

8    65.    At all times material to this Complaint, Part 606 of 21 C.F.R. set forth and

9    continues to set forth "Current Good Manufacturing Practices" for biological products generally,

10   and 21 C.F.R. § 640, *et seq.*, set forth additional good manufacturing practices for blood and

11   plasma biologicals.

12   66.    At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided

13   and continues to provide:
     Laboratory control procedures shall include: The establishment of
14   scientifically sound and appropriate specifications, standards and
     test procedures to assure that blood and blood components are safe,
15   pure, potent and effective.

16

17   67.    At all times material to this Complaint, 21 C.F.R. § 640.60 defined and

     continues to define "Source Plasma" as:
18       the fluid portion of human blood collected by plasmapheresis, and
     is intended as source material for further manufacturing use.
19

20   68.    At all times material to this Complaint, 21 C.F.R. § 640.63(c), (1999),

21   titled "Qualification of Donor," provided and continues to provide as follows with respect to

22   donors of source plasma:
     Donors shall be in good health on the day of donation, as indicated
23   in part by: . . . (9) freedom from any disease, other than malaria,
     transmissible by blood transfusion, in so far as can be determined
24   by history and examination indicated in this section; (10) freedom
     of the arms and forearms from skin punctures or scars indicative of
25   addiction to self-injected narcotics; (11) freedom from a history of
     viral hepatitis; (12) freedom from a history of close contact within
26   six months of donation with an individual having viral
     hepatitis; . . . .
27

28

Further, 21 C.F.R. § 640.63(a) provided and continues to provide that the method of determining "suitability of a donor" included "tests" as well as the taking of a history and physical examination.

69.    The foregoing statutes and regulations are evidence of the standard of care Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX. Defendants violated the foregoing regulations and/or failed to comply with applicable standards of care by:  (a) marketing "adulterated" products that were unsafe as a result of failure to comply with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse reactions and potential safety hazards as soon as there was reasonable evidence of an association with their products; (d) failing to exclude intravenous drug users who were unsuitable donors; (e) failing to exclude donors with a history of viral hepatitis who were unsuitable donors; (f) affirmatively seeking out unsuitable donors known to have viral hepatitis antibodies, as well as prison populations known to include substantial numbers of intravenous drug users, for inclusion of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to disclose their use of dangerous donors; and (h) failing to use appropriate tests and/or procedures to assure their products were safe.

**F.    Group Liability**

70.    All Defendants likely to have caused the harm to Plaintiff are parties to this lawsuit and properly before the court.

71.    The conduct of Defendants, with respect to their Factor VIII and Factor IX products and related plasma collection methods, was tortious.

72.    The harm which has been caused to Plaintiff resulted from the conduct of one, or various combinations of the Defendants, and, through no fault of Plaintiff, there may be uncertainty as to which one or combination of Defendants caused the harm.

73.    The burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiff.

74.    Factor concentrates were manufactured using the same fractionation

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   method by all Defendants. As such, during the relevant years, factor concentrates were a fungible

2   product, and physicians prescribed the products interchangeably without regards to brand names.

3        75.   The factor concentrates manufactured by Defendants contained the same

4   design flaws. They were all manufactured from paid donor plasma, which was at highest risk for

5   Hepatitis B and Hepatitis C viral transmission. In addition, all Defendants' factor concentrates

6   were made from large pools consisting of 5,000 to over 20,000 paid donors, which further

7   magnified the risk of viral transmission.

8        76.   None of the factor concentrates made by Defendants during the relevant

9   time period were subjected to viral inactivation processes such as solvent and/or detergent

10  treatment that were effective against HCV. Therefore, all of Defendants' factor concentrates

11  carried a significant risk of HCV transmission during this time. In addition, all of Defendants'

12  factor concentrate products were similarly misbranded. All of the products failed to warn of the

13  known risks enumerated in this complaint.

14  **V.    TOLLING OF APPLICABLE STATUTES OF LIMITATION**

15       77.   Any and all potentially applicable statutes of limitations have been tolled

16  by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and

17  misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation.

18  Such acts include but are not limited to intentionally covering up and refusing to disclose use of

19  high-risk plasma; selling products known to be contaminated; suppressing and subverting medical

20  and scientific research; and failing to disclose and suppressing information concerning the risk of

21  HCV transmission from Defendants' contaminated factor concentrates.

22       78.   Defendants are estopped from relying on any statutes of limitation because

23  of their fraudulent concealment and misrepresentation alleged above. Defendants were under a

24  duty to disclose the precise risks of HCV transmission from their contaminated factor concentrate

25  because this is nonpublic information over which they had exclusive control, because Defendants

26  knew this information was not readily available to people with hemophilia like Plaintiff, and

27  because this information was relevant to such people in deciding whether to use Defendants'

28  factor concentrate.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1         79.     Until very recently, Plaintiff had no knowledge that Defendants were

2   engaged in much of the wrongdoing alleged herein.  Because of the fraudulent and active

3   concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts—

4   which continue to this day—to give Plaintiff the materially false impression that Defendants

5   undertook all feasible safety precautions to reduce the risk of HCV transmission from their

6   contaminated factor concentrates, Plaintiff could not reasonably have discovered the wrongdoing

7   any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective

8   action given the unavailability, until very recently, of internal memoranda and other documents

9   (as generally described herein) as evidence in support of Plaintiff's claims.  Defendants still

10  refuse to admit and continue to conceal their wrongdoing, and therefore Defendants' acts of

11  fraudulent concealment and misrepresentation continue through the present time.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### FRAUDULENT OMISSION AND CONCEALMENT

15         80.     Plaintiff incorporates by reference all previous paragraphs of this

16  Complaint as if fully set forth here and further alleges as follows:

17         81.     Defendants had a confidential and special relationship with Plaintiff due to:

18  (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII

19  and Factor IX; (b)  Defendants' sole and/or superior knowledge of their dangerous and

20  irresponsible plasma collection practices; and (c) Defendants' direct communications with the

21  hemophiliac community through newsletters that purported to accurately convey the risk of

22  NANB.  As a result, Defendants had an affirmative duty to fully and adequately warn the

23  hemophiliac community, including Plaintiff, his guardians, and his physicians, of the true health

24  and safety risks related to their Factor VIII and Factor IX blood products and constituent plasma,

25  and a duty to disclose their dangerous and irresponsible plasma collection practices.  Independent

26  of any special relationship of confidence or trust, Defendants had a duty not to conceal the

27  dangers of their products to Plaintiff, his guardians, and his physicians.

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1       86.    As a direct and proximate result of Defendants' fraudulent concealment

2  and suppression of material health and safety risks relating to their Factor VIII and Factor IX

3  blood products and of Defendants' dangerous and irresponsible plasma collection practices,

4  Plaintiff has suffered and will continue to suffer injury, harm and economic loss.  As the direct,

5  proximate and legal result of the Defendants' fraudulent concealment and suppression of material

6  health and safety risks relating to their Factor VIII and Factor IX blood products and of

7  Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has been injured

8  and has incurred damages, including but not limited to physical injuries to his person, medical

9  expenses in the past, past disability, past loss of use of the body, and past physical and mental

10  pain and suffering; and may incur in the future medical and hospital expenses, permanent

11  disability, loss of use of the body, physical and mental pain and suffering, and loss of the

12  enjoyment of life.

13       87.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

14  together with interest thereon and costs.

15       88.    Defendants' conduct, as alleged above, was malicious, intentional and

16  outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

17  conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

18       89.    Plaintiff is informed and believes that Defendants utilize retention policies

19  that provide for scheduled destruction of documents and other items, which may result in the

20  knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and

21  necessary to adjudication of this action, including, but not limited to, records identifying batch or

22  lot numbers of Defendants' products shipped to particular treatment facilities, which may

23  facilitate product tracing.  This risk warrants an order from this Court that such evidence

24  (including all documents, data compilations, and tangible things within the meaning of Rule 26 of

25  the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

26

27

28

82. Misrepresentations made by Defendants about the health and safety of their factor concentrate products independently imposed a duty upon Defendants to fully and accurately disclose to the hemophiliac community, including Plaintiff, his guardians, and his physicians, the true health and safety risks related to Factor VIII and Factor IX and its constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices.

83. In connection with their Factor VIII and Factor IX products, Defendants fraudulently and intentionally concealed important and material health and safety product risk information from Plaintiff, his guardians, the hemophiliac community, and treating physicians, all as alleged in this Complaint.

84. Any of the following is sufficient to independently establish Defendants' liability for fraudulent omission and/or concealment:

    a. Defendants fraudulently concealed the health and safety hazards, symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

    b. Defendants fraudulently concealed the practice of using unsuitable plasma from unsuitable donors in the manufacture of their Factor VIII and Factor IX blood products;

    c. Defendants fraudulently concealed their practice of avoiding the use of available technology to detect viruses in their Factor VIII and Factor IX blood products and the components thereof;

    d. Defendants fraudulently concealed their practice of avoiding the use of available technology to destroy viruses in their Factor VIII and Factor IX blood products and the components thereof; and/or

    e. Defendants fraudulently concealed information about the known comparative risks and benefits of the use of their Factor VIII and Factor IX and the relative benefits and availability of alternate products and therapies.

85. Defendants knew that Plaintiff, his guardians, the hemophiliac community, and physicians would regard the matters Defendants concealed to be important in determining a course of treatment, including the decision whether to use their Factor VIII and/or Factor IX blood products.

1

**SECOND CLAIM FOR RELIEF**

2

**BREACH OF IMPLIED WARRANTY**

3          90.    Plaintiff incorporates by reference all previous paragraphs of this

4   Complaint as if fully set forth here and further alleges as follows:

5          91.    Defendants' factor concentrate products were intentionally designed,

6   manufactured, promoted, distributed and sold to be introduced into the human body.

7          92.    Defendants breached the implied warranties of merchantability and fitness

8   because Defendants' factor concentrate products cannot pass without objection in the trade, are

9   unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately

10  packaged and labeled.

11         93.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

12  together with interest thereon and costs.

13

**THIRD CLAIM FOR RELIEF**

14

**NEGLIGENCE**

15         94.    Plaintiff incorporates by reference all previous paragraphs of this

16  Complaint as if fully set forth here and further alleges as follows:

17         95.    Defendants marketed their Factor VIII and/or Factor IX blood products to

18  and for the benefit of Plaintiff, and knew or should have known that Plaintiff would use their

19  Factor VIII and/or Factor IX blood products.

20         96.    Defendants owed Plaintiff duties to exercise reasonable or ordinary care

21  under the circumstances in light of the generally recognized and prevailing best scientific

22  knowledge.

23         97.    Through the conduct described in the foregoing and subsequent paragraphs

24  of this Complaint, Defendants breached their duties to Plaintiff. The following sub-paragraphs

25  summarize Defendants' breaches of duties to Plaintiff and describe categories of acts or

26  omissions constituting breaches of duties by Defendants. Each and/or any of these acts or

27  omissions establishes an independent basis for Defendants' liability in negligence:

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

a.  Failure to exercise reasonable care in producing Factor VIII and Factor IX blood products that were free of viruses, including the virus that causes Hepatitis C;

b.  Failure to exercise reasonable care in assuring that only suitable plasma would be used in manufacturing their Factor VIII and Factor IX blood products;

c.  Failure to exercise reasonable care in testing plasma used in manufacturing their Factor VIII and Factor IX blood products for viral contamination;

d.  Failure to exercise reasonable care in recruiting and screening donors of plasma used in their manufacture of Factor VIII and Factor IX blood products;

e.  Failure to reasonably employ anti-viral techniques, including solvent and/or detergent treatment, in the manufacture of their Factor VIII and Factor IX blood products;

f.  Unreasonable overpromotion of their Factor VIII and Factor IX blood products;

g.  Understating the relative value of hemophilia treatments that constituted alternatives to their Factor VIII and Factor IX blood products;

h.  Failure to warn physicians, Plaintiff, his guardians, and the hemophilia community of the dangers associated with their Factor VIII and Factor IX blood products and/or the viruses and foreign bodies contained within the plasma used in manufacturing their Factor VIII and Factor IX blood products;

i.  Failure to exercise reasonable care by complying with federal regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX blood products;

j.  Failure to exercise reasonable care in disseminating information about their methods of manufacturing their Factor VIII and Factor IX blood products and the risks that were created by said methods; and

k.  Failure to exercise reasonable care in recalling their Factor VIII and Factor IX blood products.

98.    Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and other people with hemophilia would use and did use Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and well-being.

99.    As the direct, proximate and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to physical injuries

1   to his person, medical expenses in the past, past disability, past loss of use of the body, and past

2   physical and mental pain and suffering; and may incur in the future medical and hospital

3   expenses, permanent disability, loss of use of the body, physical and mental pain and suffering,

4   and loss of the enjoyment of life.

5          100.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

6   together with interest thereon and costs.

7          101.    Defendants' conduct, as alleged above, was malicious, intentional and

8   outrageous, and constituted willful and wanton disregard for the rights or safety of others.  Such

9   conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

10                         **FOURTH CLAIM FOR RELIEF**

11                            **NEGLIGENCE PER SE**

12         102.    Plaintiff incorporates by reference all previous paragraphs of this

13  Complaint as if fully set forth here and further alleges as follows:

14         103.    Defendants violated applicable federal statutes and regulations relating to

15  prescription drugs.  Plaintiff is a person whom these statutes and regulations were meant to

16  protect.

17         104.    Defendants' violation of these statutes or regulations constitutes negligence

18  per se.

19         105.    Defendants' violation of these statutes or regulations was the direct,

20  proximate and legal cause of Plaintiff's injuries and damages.  As the direct and legal result of the

21  Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not

22  limited to physical injuries to his person, medical expenses in the past, past disability, past loss of

23  use of the body, and past physical and mental pain and suffering; and may incur in the future

24  medical and hospital expenses, permanent disability, loss of use of the body, physical and mental

25  pain and suffering, and loss of the enjoyment of life.

26         106.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

27  together with interest thereon and costs.

28

1        107.  Defendants' conduct, as alleged above, was malicious, intentional and

2  outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

3  conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

4  **VII.    PRAYER FOR RELIEF**

5        WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

6        108.  For compensatory damages sustained by Plaintiff against Defendants in an

7  amount to be determined at trial;

8        109.  For punitive and exemplary damages according to proof against

9  Defendants;

10        110.  For an award of prejudgment interest, costs, disbursements and reasonable

11  attorneys' fees;

12        111.  For injunctive relief in the form of an order requiring Defendants to

13  preserve all relevant documents; and

14        112.  For such other and further relief as the Court deems equitable or

15  appropriate under the circumstances.

16

17

18  Dated:  February 22, 2008

                Elizabeth J. Cabraser

19        Elizabeth J. Cabraser (California Bar No. 83151)

20        Heather A. Foster (California Bar No. 184353)
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

21        275 Battery Street, 30th Floor
      San Francisco, CA  94111-3339

22        Telephone:  (415) 956-1000
      Facsimile:  (415) 956-1008

23        E-mail: ecabraser@lchb.com, rheimann@lchb.com,
          hfoster@lchb.com

24                  -and-

25        Steven E. Fineman (California Bar No. 140335)
      Paulina do Amaral (California Bar No. 196757)

26        Nicholas Diamand
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

27        780 Third Avenue, 48th Floor
      New York, NY 10017-2024

28        Telephone: (212) 355-9500

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    Facsimile: (212) 355-9592
     E-mail: sfineman@lchb.com; pdoamaral@lchb.com;
2    ndiamand@lchb.com

3                            -and-

4    Lexi J. Hazam (California Bar No. 224457)
     LIEFF GLOBAL, LLP
5    275 Battery Street, 30th Floor
     San Francisco, CA  94111
6    Telephone: (415) 788-8000
     Facsimile: (415) 788-8002
7    E-mail: lhazam@lieffglobal.com

8    Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1

## DEMAND FOR JURY TRIAL

2

3
Plaintiff demands a trial by jury on all issues stated.

4

5
Dated:  February 22, 2008
_____
                                                    Elizabeth J. Cabraser

6
Elizabeth J. Cabraser (California Bar No. 83151)
Heather A. Foster (California Bar No. 184353)

7
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor

8
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000

9
Facsimile:  (415) 956-1008
E-mail: ecabraser@lchb.com, rheimann@lchb.com,

10
        hfoster@lchb.com

11
                                    -and-

12
Steven E. Fineman (California Bar No. 140335)
Paulina do Amaral (California Bar No. 196757)

13
Nicholas Diamand
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

14
780 Third Avenue, 48th Floor
New York, NY 10017-2024

15
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

16
E-mail: sfineman@lchb.com; pdoamaral@lchb.com;
ndiamand@lchb.com

17

18
                                    -and-

19
Lexi J. Hazam (California Bar No. 224457)
LIEFF GLOBAL, LLP

20
275 Battery Street, 30th Floor
San Francisco, CA  94111

21
Telephone: (415) 788-8000
Facsimile: (415) 788-8002

22
E-mail: lhazam@lieffglobal.com

23
Attorneys for Plaintiff

24

25

26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☐ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                            and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       another district
       (specify)

☐ 6  Multidistrict
       Litigation

☐ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
    UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                 APPLYING IFP                  JUDGE                    MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.     Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.     Example:     U.S. Civil Statute: 47 USC 553
                                                                                            Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.**  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.